[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This is a petition under R.I.G.L. 1956 (1984 Reenactment) §34-28-13 to enforce a lien for work done and materials used in the construction of a building on certain land in the Town of Cumberland. The current respondents are XYZ Realty Corporation, the successor in title to the premises, and two encumbrancers, Fleet National Bank (hereinafter "Fleet") and Moneta Capital Corporation (hereinafter "Moneta").
The petitioner alleges that it did work on and furnished materials to a strip shopping center off Mendon Road in Cumberland between May 17 and July 13, 1989 (the "lien period") for which it has not been paid. The work was done and materials were furnished under a contract entered into on December 4, 1986 between the petitioner and XYZ's predecessors in title, Ronald Ronci (hereinafter "Ronci") and George Elwell (hereinafter "Elwell"), the original respondents in this case. (See Petitioner's Exhibit #1.) Construction on the project had come to a halt sometime in the winter of 1988-1989 and was not resumed until after the closing of a refinancing arrangement between Ronci and Elwell, on the one hand, and Fleet and Moneta, on the other, on May 12, 1989.
At the May 12, 1989 closing, after negotiation, the petitioner was paid $622,139.94 for sums due under the contract and the amount of retainage withheld under the contract up to that date was reduced to $66,168.00, which Fleet withheld from the loan proceeds pending completion of the construction contract. In addition, Fleet withheld $72,128.83 from the mortgage loan proceeds to finance the balance of work to be completed on the contract. (See Exhibit M.)
On May 17, 1989, the petitioner and respondent Ronci, together with representatives of subcontractors on the project, met at the work site. There George Calcagni (hereinafter "Calcagni"), the petitioner's principal officer, prepared a list of the work which remained to be done to complete the work agreed in the original contract and outstanding change orders. All of that work was agreed to by Ronci, who was then one of the partners who owned the land on which the work was done. The work is shown on Petitioner's Exhibit 5. All of the work, except for the installation of certain heat or smoke detectors in the tenant units, is work covered by or included in the work specified in the contract and agreed changes.
After this litigation commenced, the petitioner prepared Exhibit 6 which describes each item of work the petitioner claims it did during the lien period. The work is classified according to the area of the project on which it is done and not according to the categories shown on the petitioner's regular applications for payment under the contract. (See Respondent's Exhibits B and C.) No respondent directly disputes that petitioner did all the work shown on Exhibit 6. They rely on inferences from Exhibit B, a March 13, 1989 application for payment which shows certain categories of work 100% completed, to show that certain work was not done. On inquiry by the Court, Calcagni acknowledged that an item regarding the basement described as: "Loose rail inside goes on Future Garage Wall — $300", did not describe any work actually done, and the witness could not say when the rail had been brought to the job site. Also, the item regarding the roof described as: "Check if need Additional Ballast — $350", even though Mr. Calcagni claims that this item is the cost of actually applying such ballast, is so ambiguous as not to describe any work actually done, other than checking the roof. This document would have had much greater evidentiary weight if it had classified the work according to the categories specified in the schedules attached to the regular payment requisitions.
All of the foregoing notwithstanding, except for the two items mentioned, the Court finds that all the work described in Petitioner's Exhibit 6 was done during the lien period. That finding, however, is only the beginning and not the end of our analysis. Under § 34-28-21 the Court must "proceed to ascertain the exact nature and amount of the petitioner's claim." The Court must further give instruction to the master who sells the property as to the disposition of the proceeds of sale. See §34-28-23 and Doran v. Britto, 52 R.I. 425, 161 A. 141 (1932).
Section 34-28-1 which creates the lien which petitioner seeks to enforce refers to two sources from which the lien may arise. The section refers to work done and materials furnished pursuant to (1) "oral or written contract with", or (2) "the oral or written consent of", the owner of the land. The two sources parallel the ancient writs of special and general assumpsit. For the breach of an express contract, oral or written, the person doing work or furnishing materials was entitled only to damages in the amount of the agreed price for the work done or the materials furnished under the contract. Where a person did work or furnished materials at the request of or with the consent of an owner without any specific agreement as to price, he or she was and still is entitled to the fair value of the work or materials. Generations of lawyers learned about "quantummeruit", "quantum valebat", and the "common counts."
In this case all of the work, with one exception, was work which had an agreed price under the contract and an agreed manner in which the price was to be paid. Generally speaking, under Article V of the December 4, 1986 contract, the petitioner was to be paid at monthly intervals 90% of the portion of the contract sum allocable to work done and materials furnished for the period covered by each monthly application for payment. The full 100% became payable upon "substantial completion" of the contract. The question of whether or not this contract was "substantially completed" by the petitioner is in issue in other pending litigation and is not before the Court in this case. Since there was an agreed price for most of the work, the petitioner's expert opinion of the value of that work is not material. It is limited on its claim in this proceeding to the agreed price for that work and those materials.
The best evidence of that price is contained in Respondent's Exhibit A, the petitioner's invoice dated July 13, 1989, after which no work was done or materials brought to or incorporated in the project. There the petitioner claimed $35,660.96, which is 90% of the agreed price for work done after the May 12, 1989 closing. All other work had already been paid for at the 90% rate in accordance with the contract. Although there is evidence that the contractual relationship between the owners and the petitioner was terminated around August 25, 1989, the decision of who was responsible for that termination depends on evidence beyond the purview of this case, and which is material to other proceedings before this Court. Upon the determination of that issue will depend the petitioner's claim to receive any portion of the sums retained pending substantial completion as well as its claim for the fair value of its work reduced, if appropriate, by the owner's claim for damages for the costs, if any, beyond the unpaid sums, to complete the work described in the contract documents. (See Article V of Exhibit 1. See also Article 9 of General Conditions and Article 14 of General Conditions.)
The Court finds that the total agreed price for work done and materials furnished during the lien period was $35,660.96 divided by .9, or $39,623.29. The Court further finds that the installation of the fire and smoke detectors was an item of extra work beyond the requirements of the contract done with the consent of the owners. The fair value of the extra work and materials was $4200.00.
Calcagni testified that two disbursements by the owners ought to be credited to the petitioner's claim. They are $6,000.00 paid to L. L. Masonry and $9,507.30 paid to Nolin Electric. According to Exhibit C, item 015H, "finish electrical", however, only $2600 is claimed by Calcagni to be included in the $39,623.29 for which it was claiming payment. According to the same document no payment was claimed for "masonry" under item 004, so the $9507.30 is not included in the $39,623.29. Accordingly, the respondents are entitled to a credit of only $2,600.00.
The Court finds that the amount of the petitioner's claim which is covered by the lien is $39,623.29, minus $2,600.00, plus $4,200.00, or a total of $41,223.29.
According to rulings made during trial and confirmed in this decision, the petitioner's lien attaches to all of the land described in Exhibit B to the petition, consisting of three contiguous parcels. See § 34-28-8. A master to be appointed by the Court, upon further application by the petitioner, will sell all three parcels, unless a cash deposit in the amount of $60,000 shall be made to the registry of this Court pending final disposition of this cause.
There remains the question of priority among the liens of the petitioner and the encumbrances. Priorities are established by §34-28-25. Notice of the intention to claim this lien was filed on August 30, 1989. The mortgage lien of Fleet National Bank attached on May 15, 1989 to premises, identified as lot number 53 on Cumberland Tax Assessor's Plat number 58 on the notice of intention filed on August 30, 1989 and as Parcel 3 in Exhibit B attached to the notice of lis pendens (Petitioner's Exhibit 4). The mortgage lien of Moneta Capital Corporation attached to the same parcel on May 18, 1989. The liens of Fleet and Moneta on this parcel are senior to petitioner's.
The lien created by the May 15, 1989 Fleet mortgage was extended to include two contiguous and additional parcels, lots 17 and 18, on a recorded plat entitled, Berkshire Heights, Addition No. 1, etc. The mortgage of those two parcels was not, however, recorded until December 11, 1989. Hence, it is junior to the petitioner's lien. Moneta does not appear to claim any lien on these two lots. According to the record produced at this hearing, the petitioner's lien on lots 17 and 18 is senior to all encumbrances of record.
The master will first sell the latter two lots. If such a sale yields sufficient proceeds to satisfy the petitioner's lien, including its interest and costs, and the master's costs, the master will not sell the remaining parcel. If the proceeds from the sale of the two smaller parcels are not sufficient to satisfy the petitioner's lien, together with interest and costs and the master's costs, then the master may sell the remaining parcel subject to the liens of Fleet and Moneta.
The petitioner will present a judgment for entry on notice to the respondents.